1
2
3
4
5
6

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

7

MICHELLE ROBINSON,                    )          3:09-cv-00138-RAM
                                       )
8              Plaintiff,              )          **MEMORANDUM DECISION
                                       )          AND ORDER**
9        vs.                           )
                                       )
10  RUSSELL SMITH, et al.,             )
                                       )
11             Defendants.             )
                                       )
12  _____)

13        Before the court is Defendant Russell Smith's Motion for Summary Judgment

14  (Doc. #81),[1] Defendant Jim Parrish's Motion for Summary Judgment (Doc. #82), and

15  Defendant Humboldt County School District's Motion for Summary Judgment (Doc.#79).

16  Plaintiff has opposed all three motions,  (Docs. # 96, 95, 94), and Defendants have replied

17  (Docs. #107, 106, 105).  After a thorough review, the court grants Defendants' motions for

18  summary judgment as to Plaintiff's federal claims and dismisses Plaintiff's state law claims

19  without prejudice.

20                              **I. BACKGROUND**

21        Plaintiff Michelle Robinson is a former employee of the Humboldt County District

22  Attorney's Office and a former intern of the Humboldt County School District (HCSD).  (Pl.'s

23  Second Am. Compl. 5 (Doc. #40); HCSD's Mot. for Summ. J. 2 (Doc. #79).) Defendant Russell

24  Smith is the Humboldt County District Attorney.  (Smith's Mot. for Summ. J. 2 (Doc. #81.)

25  Defendant Jim Parrish is the Chief Executive Officer of Humboldt General Hospital. (Parrish's

26

27        [1]  Refers to the court's docket number

28                                        1

1  Mot. for Summ. J. 4 (Doc. #82.)  Plaintiff asserts thirty-four claims against Defendants under

2  42 U.S.C. §§ 1983, 1985, and Nevada state law.  (Pl.'s Second Am. Compl. 4-81.)  Plaintiff seeks

3  damages, costs, attorney's fees, and injunctive relief. (*Id.* at 80-89.)

4       In orders issued November 5, 2009, and January 5, 2010, the court dismissed claims

5  thirty-three and twelve.  (Docs. #63, 65.)  The remaining thirty-two claims arise from the

6  events described below.

7  **A.       PLAINTIFF'S EMPLOYMENT AT THE DA'S OFFICE**

8       Plaintiff commenced employment with the Humboldt County District Attorney's Office

9  (DA's Office) in October 2005 as a Victim Witness Advocate.  (Smith's Mot. for Summ. J 2.)

10  Funding for the Victim Witness Advocate position was provided by the Services, Training,

11  Officers, and Prosecutors Grant program administered by the Nevada Attorney General's

12  Office. (*Id.*)  Plaintiff was an at-will employee whose compensation was directly tied to the

13  grant program. (*Id.* at 2, Ex. 3 at 6.)  As a Victim Witness Advocate, Plaintiff was responsible

14  for assisting victims of domestic violence or sexual assault as their cases progressed through

15  the legal system. (*Id.* at 2.)  A component of those responsibilities included coordinating with

16  the Sexual Assault Response Team (SART) in Reno if a victim required a sexual assault exam.

17  (*Id.* Ex. 2 at 17.)

18       At some point in 2007, Plaintiff and Smith met with Parrish to ascertain whether

19  Humboldt General Hospital would be interested in participating in a SART program so that

20  sexual assault exams could be performed locally in Winnemucca instead of in Reno. (*Id.* at 2;

21  Parrish's Mot. for Summ. J. 6; Pl.'s Opp'n to Smith's Mot. 2 (Doc. #96).)  Parrish expressed

22  support for the SART program and in partnering with the DA's Office. (Pl.'s Opp'n to Smith's

23  Mot. 2.)  The hospital board also supported the program and partnership. (Parish's Mot. for

24  Summ. J. 6.)  Although the precise logistics of the program and partnership were not fleshed

25  out at the meeting between Plaintiff, Smith, and Parrish, Plaintiff left the meeting with the

26  impression that there was a cooperative effort on the part of the hospital to have sexual assault

27  exams performed at the hospital. (*Id.* at 6-7.)

28

On February 15, 2008, Plaintiff was in the process of preparing a grant application to obtain funding for the SART program at Humboldt General Hospital. (Pl.'s Opp'n to Smith's Mot. 3.) In order to approximate the cost of hospital supplies that would be used in conducting a sexual assault exam, Plaintiff called a hospital employee for information. (*Id.*) The employee did not have the information Plaintiff requested immediately available, so she told Plaintiff she would call her back later that day. (*Id.* Ex. 12 at 77.) The employee called Plaintiff back in the afternoon and informed Plaintiff that she could not provide the information Plaintiff requested because Parrish told the employee that the SART program would not be coming to Humboldt General Hospital. (Parrish's Mot. for Summ. J. Ex. 7 at 259-60.) The employee suggested that Plaintiff contact Parrish. (*Id.*) After concluding her phone call with the hospital employee, Plaintiff immediately called Parrish. (*Id.* at 8.) According to Plaintiff, Parrish stated that Rita Clement, a nurse at the hospital, was concerned about privacy issues associated with treating sexual assault victims in the emergency room. (*Id.*) Plaintiff reminded Parrish of the verbal agreement between the DA's Office and the hospital and suggested to Parrish some methods that might address the privacy concerns. (*Id.* at 8-9.) Parrish acknowledged the verbal agreement and indicated that he would be open to discussing the matter further. (*Id.* at 9.) According to Plaintiff, her conversation with Parrish ended cordially, and she told Parrish that she would contact Smith and would be in touch. (*Id.* Ex. 7 at 271-72.)

At the conclusion of her conversation with Parrish, Plaintiff immediately called Smith, who was traveling out of town for the holiday weekend. (*Id.* at 9.) Plaintiff told Smith that she was working on the grant and that Parrish had just told her that he did not want SART at the hospital. (*Id.*) Smith told Plaintiff that he would meet or speak with Parrish the following Tuesday when he returned to town. (*Id.*) According to Plaintiff, she and Smith were disconnected twice during their conversation. (*Id.* Ex. 6 at 88-89.) After the second disconnection, Plaintiff states that she attempted to call Smith back but was unable to get in touch with him. (*Id.* Ex. 6 at 89.)

The parties sharply contest whether Smith gave Plaintiff a specific directive not to do

3

1   anything further during the phone conversation.  Plaintiff does not recall Smith telling her not

2   to do anything else until he returned to town.  (*Id*. Ex. 6 at 90.)  Smith, on the other hand,

3   maintains that he told Plaintiff not to do anything else in regard to the information she had

4   learned from Parrish.  (Smith's Mot. for Summ. J. Ex. 2 at 55.)  According to Smith, he told

5   Plaintiff that he believed that she was probably mistaken about her conversation with Parrish

6   and that he would work through the issue with Parrish when he returned.  (*Id*.)

7        After speaking with Smith, Plaintiff made calls to the Nevada Attorney General's Office,

8   the County Commissioner, and a member of the hospital's board.  (Parrish's Mot. for Summ.

9   J. 9.)  Plaintiff states that she made the phone calls because she could not get in touch with

10  Smith and was concerned about the SART-hospital partnership falling apart.  (*Id*. Ex. 7 at 277-

11  78.)  Additionally, Plaintiff wrote an email concerning the SART program, Humboldt General

12  Hospital, and her conversation with Parrish.  (*Id*. 9, Ex. 9.)  In part, the email stated that the

13  "ER and hospital staff currently turns away ALL victims of sexual assault and will not provide

14  an exam or treatment for them."  (*Id*. Ex. 9 at 1.)  The email described the SART-hospital

15  partnership plan and that Plaintiff had spoken to Parrish who told her that nurse Clement did

16  not "want sexual assault exams done or medical assistance provided to victims of sexual assault

17  at Humboldt General Hospital." (*Id*.)  The email emphasized the importance of the issue with

18  the hospital because of the percentage of women who are victims of sexual assault.  (*Id*. Ex. 9

19  at 2.)  The end of the email included the phone number for Humboldt General Hospital,

20  Parrish's email, and Clement's email.  (*Id*.)  Plaintiff sent the email at 5:24 p.m. to "undisclosed

21  recipients."  (*Id*. Ex. 9 at 1.)  According to Plaintiff, she sent the email to six volunteer SART

22  advocates and Lori Savoie, a nurse at the hospital who was undergoing training to participate

23  in the SART program.  (*Id*. Ex. 6 at 100-01.)  Plaintiff states that she did not send the email to

24  the newspaper and did not intend the email to be disseminated to the public.  (*Id*. Ex. 7 at 277,

25  285, 296.) However, Plaintiff states that she expected the email would provoke a community

26  response.  (Pl.'s Opp'n to Summ. J. Ex. 18 at 2.)

27  / / /

28                                                4

On or about February 19, 2008, Nicole Maher, Humboldt General Hospital's contractor for public relations, informed Smith of the February 15, 2008 email. (Smith's Mot. for Summ. J. 4, Ex. 2 at 68; Parrish's Mot. for Summ. J. Ex. 1 at 68.) According to Smith, Maher told him that the email itself indicated that Plaintiff had sent it. (Smith's Mot. for Summ. J. 4.) Smith states that he was disappointed and concerned when he heard about the email because Plaintiff had directly disobeyed him by sending it and the email contained untruths about the hospital. (*Id.* at 68-69.) After speaking with Maher, Smith called Plaintiff into his office to inquire about the email. (*Id.* at 69.) According to Smith, he asked Plaintiff if she knew anything about the email, and Plaintiff told him she did not, but she would ask around the community to see if anybody knew anything about it. (*Id.* at 70.)

Parrish received Plaintiff's February 15, 2008 email at some point before February 29, 2008. (Parrish's Mot. for Summ. J. Ex. 1 at 67.) Parrish was upset and disappointed in the email because he felt it contained inaccuracies and that it could potentially cause a division between the DA's Office, the hospital, and the police department. (*Id.* Ex. 1 at 67-68.) A week after the email was sent, Parrish instructed Maher to organize a SART meeting to clear the air with the issues surrounding the program. (*Id.* Ex. 1 at 65, 68.)

On February 29, 2008, a meeting was held at Humboldt General Hospital. (*Id.* Ex. 1 at 41.) Those attending the meeting included Plaintiff, Smith, Parrish, members of the DA's office, the police department, and hospital staff and nurses. (Smith's Mot. for Summ. J. Ex. 2 at 77.) At the meeting, the February 15, 2008 email was discussed. (Pl.'s Opp'n to Summ. J. 9.) According to Plaintiff, she was never asked any direct questions about the February 15, 2008 email. (*Id.*) Smith and Parrish, on the other hand, state that Plaintiff disavowed authorship of the email at the meeting. (Smith's Mot. for Summ. J. 5; Parrish's Mot. for Summ. J. 12-13.) Plaintiff states that during the meeting Parrish said that he wanted the person responsible for the email taken care of. (Pl.'s Opp'n to Smith's Mot. 9.) At some point during the meeting, Smith asked Parrish to send him the February 15, 2008 email. (*Id.* at 10.)

/ / /

1    After the meeting, Parrish sent a letter to Smith along with the February 15, 2008 email.

2 (*Id*.)  In his letter, Parrish wrote that as Smith read the email he would see why Parrish was so

3 disappointed in the DA's Office.  (Parrish's Mot. for Summ. J. Ex. 4.)  Parrish stated that he

4 thought Plaintiff's claim that she did not know of the email was "disingenuous."  (*Id*. Ex. 4)

5 Parrish stated that he was confident Smith would handle the situation in a prompt and

6 professional manner.  (*Id*. Ex. 4.)

7    Plaintiff met with Smith on March 7, 2008.  (Smith's Mot. for Summ. J. 5.)  Deputy

8 District Attorney Theresa Wriston was also present at the meeting.  (*Id*. Ex. 2 at 97.)  According

9 to Smith, at this meeting, he gave Plaintiff an opportunity to resign because there had been a

10 breakdown and he could no longer trust her.  (*Id*. Ex. 2 at 82.)  Plaintiff resigned.  (Parrish's

11 Mot. for Summ. J. Ex. 12.)  Smith states that if Plaintiff had not resigned, he would have

12 terminated her. (Smith's Mot. for Summ. J. Ex. 2 at 97.)  Smith states that he did not explain

13 to Plaintiff the reason he was seeking her resignation.  (*Id*. at 5.)  However, Plaintiff states that

14 when she asked Smith if she was being asked to resign because of the February 15, 2008 email,

15 Smith nodded his head.  (Pl.'s Opp'n to Smith's Mot. 10.)

16 **B.    PLAINTIFF'S APPLICATION TO THE NEVADA COUNCIL FOR THE PREVENTION OF**

17 **DOMESTIC VIOLENCE**

18    During the summer of 2008, Plaintiff applied to become a member of the Nevada

Council for the Prevention of Domestic Violence.  (Pl.'s Opp'n to Smith's Mot. 24.)  On July 21,

19 2008, the council met and discussed the applications for membership.  (*Id*.)  At the meeting,

20 Kareen Prentice stated that she knew that Plaintiff was formerly employed at the DA's Office

21 but that Smith "had to let her go" for a performance issue.  (*Id*. Ex. 39.)  Prentice stated that

22 she was "aware of the circumstances."  (*Id*. Ex. 39.)  Another person suggested that Smith be

23 contacted.  (*Id*. Ex. 39.)  Suzanne Ramos contacted Smith regarding Plaintiff's application to

24 the council.  (Smith's Mot. for Summ. J. Ex. 11.)  At the time Ramos spoke to Smith, Smith was

25 a member of the council.  (*Id*. Ex. 11.)  Smith informed Ramos that he had reservations about

26 Plaintiff and the he would find it difficult to work with her on the council.  (*Id*. Ex. 11.)

27

28                                                         6

1  According to Ramos, Smith indicated that he did not feel comfortable speaking about specific

2  issues concerning Plaintiff. (*Id*. Ex. 11.)

3      At a meeting held August 7, 2008, the council discussed Plaintiff's application. (Pl.'s

4  Opp'n to Smith's Mot. Ex. 40 at 2.) Ramos stated that after speaking with Smith, she had

5  reservations about Plaintiff. (*Id*. Ex. 40 at 2.) Ramos stated that Plaintiff was let go from her

6  position, and "things occurred in the rural community that were not beneficial for the overall

7  community." (*Id*. Ex. 40 at 2.) After another committee member asked Ramos if she could

8  discuss what happened, Ramos stated that "she would be careful with regard to that." (*Id*. Ex.

9  40 at 2.) Plaintiff's application was found insufficient to advance to the next level of the

10 application process. (Smith's Mot. for Summ. J. Ex. 11.) Ramos states that Plaintiff's

11 application was found insufficient to advance based solely on her written application. (*Id*. Ex.

12 11.)

13 **C.    PLAINTIFF'S INTERNSHIP WITH THE HUMBOLDT COUNTY SCHOOL DISTRICT**

14     Plaintiff applied with the Humboldt County School District (HCDS) to work as a

15 counselor intern beginning in August 2008 so that she could attain the 280 hours necessary

16 for her to obtain her license with the Nevada Department of Education. (Smith's Mot. for

17 Summ. J. 6; Pl.'s Opp'n to Smith's Mot. 10-11.) Plaintiff commenced her internship on August,

18 19, 2008, at Lowry High School. (HCSD's Mot. for Summ. J. 2.)

19     During May 2008, Smith was contacted by a victim of domestic abuse who had

20 participated in the Victim Witness Advocate Program and interacted with Plaintiff. (Smith's

21 Mot. for Summ. J. 6.) According to Smith, the victim told him, in part, that: (1) she and

22 Plaintiff had gone out drinking together on a number of occasions while she was participating

23 in the Victim Witness Advocate Program; (2) she saw Plaintiff create a demeaning MySpace

24 profile concerning Deputy Sherriff Kevin Malone in which Plaintiff referred to Malone as

25 "insecure," a "one-minute man," and "gay"; (3) Plaintiff shared with her some aspects of the

26 Wiccan religion while she was participating in the Victim Witness Program. (*Id*. at 7-9.) Smith

27 also states that at some point he learned from Andrea Zeller that Plaintiff had consumed

28                                                7

1   alcohol while acting as a chaperone at a Stand Tall – Don't Fall Youth Leadership Camp. (*Id*.
2   at 9-10.)

3       On or about August 27, 2008, Deborah Watts, the principal at Lowry High School,
4   received a call from Virginia Ragsdale, an employee at the DA's Office. (Pl.'s Opp'n to Smith's
5   Mot. 12, Ex. 32.) Ragsdale indicated that Watts should meet with Smith but did not provide
6   any other details. (*Id*. Ex. 33 at 1.) Watts met with Smith on August 28, 2008. (*Id*. Ex. 33 at
7   2.) According to Watts, Smith told her that Plaintiff: (1) exposed students to alcohol while
8   chaperoning a "Stand Tall – Don't Fall" program in Arizona; (2) verbally intimidated victims
9   while working as a Victim Witness Advocate; (3) advised a victim that she would be better off
10  relying on the "Wiccan" religion than her own faith; (4) was not a safe person to be working
11  with students; (5) inappropriately drank alcohol with a victim she was assisting as a Victim
12  Witness Advocate; and (6) had slandered a local police officer. (*Id*. Ex. 22 at 2.) After her
13  meeting with Smith, Watts contacted Kraig Lords, a psychologist at HCDS who had arranged
14  for Plaintiff's internship placement. (*Id*. Ex. 22 at 2-3; Ex. 27 at 1.) Watts told Lords that she
15  had learned some disturbing information about Plaintiff and that she did not want Plaintiff
16  working with students at her school if that information was true. (*Id*. Ex. 22 at 2-3.) Watts
17  asked Lords to contact Smith. (*Id*. Ex. 22 at 3.)

18      After his conversation with Watts, Lords told Plaintiff a disturbing phone call had been
19  received from Smith and that she needed to go home until the matter was settled. (HCSD's
20  Mot. for Summ. J. Ex 1 at 377.) Lords told Plaintiff that he was going to meet with Smith the
21  next day. (*Id*. Ex. 1 at 379.) As planned, Lords met with Smith on August 29, 2008. (Pl.'s
22  Opp'n to Smith's Mot. Ex. 28 at 48.) Smith communicated to Lords the same information he
23  communicated to Watts in more detail. (*Id*. Ex.28 at 48-49, 54; Ex. 27 at 2.) After his meeting
24  with Smith, Lords went directly to speak with Superintendent Mike Bumgartner and Assistant
25  Superintendent Dave Jensen and relayed to them what Smith had told him and that he had
26  sent Plaintiff home. (*Id*. Ex. 28 at 53, 55-56, 85-86.) Later that day, after speaking with Watts,
27  Bumgartner and Jensen told Lords that he needed to tell Plaintiff that her internship was done.

28                                          8

1   (*Id*. Ex. 28 at 58-59.)

2       On September 2, 2008, Plaintiff met with Lords and Dori Wilson, the school counselor

3   Plaintiff had been shadowing. (HCSD's Mot. for Summ. J. Ex. 1 at 381.) Lords told Plaintiff

4   some of the information Smith had told him and that her internship was going to be

5   terminated. (*Id*. at 381-85; Pl.'s Opp'n to Summ. J. Ex. 28 at 65.) Plaintiff told Lords and

6   Wilson that the information from Smith was not true and that other individuals could confirm

7   that. (HCSD's Mot. for Summ. J Ex. 1 at 384-87.) Lords suggested that Plaintiff retain legal

8   counsel. (*Id*. at 383.)

9       Between September 2, 2008, and January 2009, Plaintiff's counsel communicated with

10  HCSD's counsel about reinstating Plaintiff's internship. (*Id*. at 387-89.) During this time

11  period, Bumgartner contacted Smith and told Smith that HCSD was relying on the information

12  he provided in ending Plaintiff's internship. (*Id*. Ex. 2 at 2.) According to Bumgartner, Smith

13  told him that he would not back down from his previous statements and that Smith said he

14  would be willing to testify to everything he had told the HCSD. (*Id*.) In January 2009,

15  Bumgartner, Jensen, Watts, Lords, and HCSD's counsel met to reconsider Plaintiff's

16  internship. (*Id*.; Pl.'s Opp'n to Smith's Mot. Ex. 31 at 42-43.) The information they received

17  from Smith was discussed, and Bamgartner determined that Plaintiff's internship should not

18  be reinstated. (HCSD's Mot. for Summ. J. Ex. 2 at 2.)

19                          **II. LEGAL STANDARD**

20      The purpose of summary judgment is to avoid unnecessary trials when there is no

21  dispute over the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d

22  1468, 1471 (9th Cir. 1994). All reasonable inferences are drawn in favor of the non-moving

23  party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*,

24  477 U.S. 242, 244 (1986)). Summary judgment is appropriate if "the pleadings, the discovery

25  and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

26  material fact and that the movant is entitled to judgment as a matter of law." *Id*. (citing Fed.

27  R. Civ. P. 56(c)). Where reasonable minds could differ on the material facts at issue, however,

28

9

summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 516 U.S. 1171 (1996). In deciding whether to grant summary judgment, the court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials of the pleadings, but must set forth specific facts showing there is a genuine issue for trial. *Anderson,* 477 U.S. at 248. Although the parties may submit evidence in an inadmissible form, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. Fed. R. Civ. P. 56(c).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *Anderson*, 477 U.S. at 248. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* Where there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

## III. DISCUSSION

### A.   SECTION § 1983 FIRST AMENDMENT RETALIATION CLAIM

Plaintiff claims that Smith retaliated against her in violation of the First Amendment. (Pl.'s Second Am. Compl. 4-13.) Plaintiff alleges that Smith constructively discharged her for sending the February 15, 2008 email. (*Id.*)

10

1    Smith argues that Plaintiff's retaliation claim fails as a matter of law because she did not

2    engage in protected speech and her speech was not a substantial or motivating factor for the

3    alleged adverse employment action.  (Smith's Mot. for Summ. J. 13-16.)

4    To prevail on a First Amendment retaliation claim against a government employer, a

5    plaintiff "must show (1) the employee engaged in constitutionally protected speech, (2) the

6    employer took adverse employment action against the employee, and (3) the employee's speech

7    was a 'substantial or motivating' factor in the adverse action." *Posey v. Lake Pend Oreille Sch.*

8    *Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (quoting *Freitag v. Ayers*, 468 F.3d 528, 543

9    (9th Cir. 2006)).  The Ninth Circuit recently outlined a sequential five-step inquiry for

10   assessing a First Amendment retaliation claim: "(1) whether the plaintiff spoke on a matter of

11   public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3)

12   whether the plaintiff's protected speech was a substantial or motivating factor in the adverse

13   employment action; (4) whether the state had an adequate justification for treating the

14   employee differently from other members of the general public; and (5) whether the state

15   would have taken the adverse employment action even absent the protected speech." *Eng v.*

16   *Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).  A plaintiff's failure to meet one of the above five

17   factors ends the court's inquiry.  *Huppert v. City of Pittsburg*, 574 F.3d 696, 703 (9th Cir.

18   2009).

19   A "plaintiff bears the burden of showing the speech was spoken in the capacity of a

20   private citizen and not a public employee." *Eng*, 552 F.3d at 1071.  "[P]ublic employees do not

21   shed their First Amendment rights simply because they are employed by the government."

22   *Huppert*, 574 F.3d at 702.  If public employees speak as a citizens on a matter of public

23   concern, the First Amendment shields their speech.  *Id*.  However, "when public employees

24   make statements pursuant to their official duties, the employees are not speaking as citizens

25   for First Amendment purposes, and the Constitution does not insulate their communications

26   from employer discipline." *Id*. (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)).  The

27   scope and content of a plaintiff's job responsibilities is a question of fact. *Eng*, 552 F.3d at 1071.

28

11

However, the "ultimate constitutional significance of the facts" is a question of law. *Id.* (citations and internal quotations omitted). Thus, in evaluating whether a plaintiff spoke as a private citizen, the court assumes the truth of the facts as alleged by the plaintiff with respect to employment responsibilities. *Id.*

Here, even if Plaintiff shows that her February 15, 2008 email addressed a matter of public concern, she fails to show that she spoke as a private citizen and not as a public employee. "Statements are made in the speaker's capacity as [a] citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Eng*, 552 F.3d at 1071. The First Amendment does not protect speech which "owes its existence to an employee's professional responsibilities." *Huppert*, 574 F.3d at 704 (citations omitted). In this case, Plaintiff's February 15, 2008 email was a product of the tasks she was paid to perform as the Victim Witness Advocate for the DA's Office. In part, Plaintiff's duties at the DA's Office consisted of coordinating the SART program and preparing the grant application to obtain funding for a local SART program. The content of Plaintiff's email directly aims at generating support for the SART program. Moreover, Plaintiff sent her email to six SART volunteer advocates and the nurse training to be the SART nurse after making several phone calls because of her concern that the SART-hospital partnership was falling apart. Both the subject matter and recipients of Plaintiff's email are tied to Plaintiff's efforts with the SART program.

Plaintiff argues that she was acting as a private citizen when she sent her email because she sent the email from her home, using her own email address, from her own computer after work hours, and did not send the email to co-workers. (Pl.'s Opp'n to Smith's Mot. 30.) However, Plaintiff testified that she sometimes conducted business from her home and that immediately before sending the email, she was making phone calls and writing the grant application, from her home, in her capacity as a Victim Witness Advocate. (Parrish's Mot. for Summ. J. Ex. 6 at 96, 99-100; Smith's Reply Ex. 17 at 264-65.) Furthermore, Plaintiff testified that she used her personal cell phone for business. (Smith's Reply Ex.1 17 at 258.) Therefore,

1   the mere fact that Plaintiff used her personal computer and email address to send the email

2   fails to sufficiently show that she acted as a private citizen when Plaintiff used her personal cell

3   phone to conduct business and conducted business from her home.  In sum, Plaintiff generated

4   the email in close temporal proximity to undertaking tasks which she describes as being done

5   in her capacity as the Victim Witness Advocate.  Plaintiff sent the email to SART volunteer

6   advocates and the SART nurse-in-training to generate support for the SART program.  In

7   viewing the facts in the light most favorable to Plaintiff, the court finds that she sent the

8   Februrary 15, 2008 email in her capacity as a public employee and not as a private citizen.

9   Thus, Plaintiff fails to show that she undertook speech protected by the First Amendment, and

10  Smith is entitled to summary judgment on Plaintiff's First Amendment retaliation claim in

11  count 1.

12  **B.    SECTION § 1983 SUBSTANTIVE DUE PROCESS CLAIMS – PROPERTY INTEREST**

13          Plaintiff alleges that Smith and HCSD deprived her of constitutionally protected

14  property interests in violation of her substantive due process rights under the Fourteenth

15  Amendment. (Pl.'s Second Am. Compl. 13-15, 59-60.)  Plaintiff claims that Smith deprived her

16  of her property interest in continued employment at the DA's Office when he constructively

17  discharged her.  (*Id*. at 13-15.)  Plaintiff claims that HCSD deprived her of her property interest

18  in her internship when it terminated her internship.  (*Id*. at 59-60.)

19          Smith and HCSD argue that Plaintiff fails to establish a constitutionally protected

20  property interest either in her employment at the DA's Office or her internship at HCSD.

21  (Smith's Mot. for Summ. J. 17-18; HCSD's Mot. for Summ. J. 7-9.)

22          Substantive due process forbids the government from depriving a person of life, liberty,

23  or property in such a way that "shocks the conscience" or "interferes with rights implicit in the

24  concept of ordered liberty."  *United States v. Salerno*, 481 U.S. 739, 746 (1987) (citations

25  omitted).  A threshold requirement to a substantive due process claim is the showing of a

26  fundamental liberty or property interest protected by the Constitution.  *Enquist v. Oregon*

27  *Department of Agriculture*, 478 F.3d 985, 997 (9th Cir. 2007).  "'To have a property interest

28

1    in a benefit, a person clearly must have more than an abstract need or desire' and 'more than

2    a unilateral expectation of it. He [or she] must, instead, have a legitimate claim of entitlement

3    to it.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (quoting *Board of Regents*

4    *of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).   Entitlements giving rise to a property

5    interests  are  not  created  by  the  Constitution.    *Id*.    "Rather,  they  are  created  and  their

6    dimensions  are  defined by existing rules or understandings that stem from an independent

7    source such as state law."  *Id*. (quoting *Paul v. Davis*, 424 U.S. 693, 709 (1976)).  "Where . . .

8    a  state  employee  serves  at  will,  he  or  she  has  no  reasonable  expectation  of  continued

9    employment,  and  thus  no  property  right."   *Dyack v. Commonwealth of the N. Mariana*

10   *Islands*, 317 F.3d 1030, 1033 (9th Cir. 2003).  Under Nevada law, employees are presumed to

11   be at will and may be dismissed with out without cause, so long as the dismissal does not offend

12   Nevada's public policy.  *Ozawa v. Vision Airlines, Inc*., 216 P.3d 788, 791 (Nev. 2009).

13            1.    Employment at DA's Office

14            Plaintiff does not dispute that her employment as the Victim Witness Advocate at the

15   DA's Office was at-will employment.  (Pl.'s Opp'n to Smith's Mot. 35.)  Nonetheless, Plaintiff

16   argues that she had a legitimate claim of entitlement to continued employment because the

17   DA's Office had a policy and practice of only discharging full-time employees for cause and

18   after undertaking progressive discipline.  (*Id*.)  In support of her argument, Plaintiff submits

19   an affidavit of a former Chief Deputy District Attorney who states that in her experience, the

20   DA's Office "generally" subjected employees to progressive discipline and did not immediately

21   dismiss them for a violation of office policy or for poor performance.  (*Id*. Ex. 2 at 1.)  However,

22   Plaintiff fails to submit any evidence that she, personally, could only be terminated for cause

23   or  that  a  contract  or  other  state  law  applying  to  her  created  a  property  interest  in  her

24   employment.  *See Pressler v. City of Reno*, 118 Nev. 506, 510 (Nev. 2002).  Plaintiff's nebulous

25   argument about the general practices of the DA's Office fails to establish a property interest in

26   her continued employment at the DA's Office.  Therefore, the court grants Smith summary

27   judgment on Plaintiff's substantive due process claim in count 2.

28

2.      Internship at HCSD

Plaintiff contends that she had a legitimate claim of entitlement to complete her internship with the HCSD because she entered into a contract with Lords.  (Pl.'s Opp'n to HCSD's Mot. 22 (Doc. #94).)  HCSD argues that Plaintiff was a voluntary, unpaid intern and that she fails to provide evidence showing that she was an employee.  (HCSD's Reply 5 (Doc. #105).)  According to HCSD, even if Plaintiff could establish she was an employee, she would have been an at-will employee. (*Id.*) The court agrees with HCSD.  At most, Plaintiff's evidence supports the existence of an implied employment contract with HCSD.  However, as discussed above, employment in Nevada is presumed to be at will, and at-will employment fails to give rise to a protected property interest.  Even if an enforceable employment contract existed between Plaintiff and HCSD, Plaintiff provides no evidence that her employment was anything other than at-will employment.  Therefore, Plaintiff fails to establish a property interest in completing her internship with HCSD.  Without a protected property interest, Plaintiff's substantive due process claim fails, and HCSD is entitled to summary judgment on count 23.

**C.   SECTION § 1983 SUBSTANTIVE DUE PROCESS CLAIMS – LIBERTY INTEREST**

Plaintiff alleges that Smith and HCSD deprived her of constitutionally protected liberty interests in violation of her substantive due process rights under the Fourteenth Amendment.  (Pl.'s Second Am. Compl. 15-16, 31-33, 61.)[2]  Plaintiff claims that Smith deprived her of a liberty interest in practicing her profession and pursuing her livelihood when he (1) constructively discharged her from employment and (2) prevented her from being appointed to the Nevada Council for the Prevention of Domestic Violence.  (*Id.* at 16, 32.)  Plaintiff claims that HCSD

---

[2]  In count 27, Plaintiff alleges that Smith and HCSD violated her right to the free exercise of religion as protected by her substantive due process rights to liberty under the Due Process Clause of the Fourteenth Amendment.  (Pl.'s Second. Am. Compl. 66-68.)  However, this claim is more appropriately analyzed under the First Amendment.  "[W]here a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing a plaintiffs claims."  *Patel v. Penman*, 103 F.3d 868, 874 (9th Cir. 1996) (citations, internal quotations, and brackets omitted), *overruled in part on other grounds as recognized by Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086 (9th Cir. 2007).  Thus, the court addresses Plaintiff's allegations in count 27 as they are pleaded in her First Amendment claim in count 26.

1    deprived her of a liberty interest in the continuation of her internship.  (*Id*. at 61.)

2        Smith and HCSD argue that Plaintiff fails to establish protected liberty interests arising

3    from her employment at the DA's Office, application to the council, or internship with HCSD.

4    (Smith's Mot. for Summ. J. 18-19; HCSD's Mot. for Summ. J. 9-10.)

5        "The termination of a public employee which includes publication of stigmatizing

6    charges triggers due process protections."  *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169,

7    1179 (9th Cir. 1998).  To establish a liberty interest giving rise to due process protections, a

8    plaintiff must show: (1) the public disclosure of a stigmatizing statement; (2) the accuracy of

9    the stigmatizing statement is contested; and (3) the stigmatizing statement is made in

10   connection with the denial of a tangible interest, such as employment, or the alteration of a

11   right or status recognized by state law.  *Tibbetts v. Kulongoski*, 567 F.3d 529, 536-37 (9th Cir.

12   2009); *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 982 (9th Cir. 2002); *Mustafa*,

13   157 F.3d at 1179.  If a liberty interest is implicated, the employee must be given an opportunity

14   to refute the stigmatizing charge.  *Mustafa*, 157 F.3d at 1179.

15           1.    Employment at DA's Office and Application to the Nevada Council for the
                  Prevention of Domestic Violence

16

17       Plaintiff argues that Smith publicized her discharge from the DA's Office: (1) to Maher

18   and Parrish at the February 29, 2008 meeting; (2) to Prentice and Ramos, two members of the

19   Nevada Council for the Prevention of Domestic Violence; and (3) and to HCSD employees.

20   (Pl.'s Opp'n to Smith's Mot. 35.-36.)

21       First, Plaintiff fails to show that Smith publicized any stigmatizing statements that

22   impaired Plaintiff's reputation for honesty or morality at the February 29, 2008 meeting.  "A

23   liberty interest is implicated in the employment termination context if the charge impairs a

24   reputation for honesty or morality."  *Tibbetts,* 567 F.3d at 535 (citations, quotations, and

25   alteration omitted).  Here, Plaintiff alleges that she "was subjected to a virtual *star chamber*

26   or inquisition on February 29, 2008 wherein she was attacked in the presence of all sorts of

27   people." (Pl.'s Opp'n to Smith's Mot. 35-36.)  Aside from this lone allegation, Plaintiff fails to

28

                                        16

identify statements made by Smith to Maher and Parrish that impugned her reputation for honesty or morality. At most, Plaintiff provides evidence that Smith told Maher after the meeting that he was likely to terminate Robinson for sending the February 15, 2008 email. (Pl.'s Opp'n to Smith's Mot. Ex. 2 at 3.) Although this statement describes Plaintiff's likely termination, it contains no information regarding Plaintiff's honesty or morality. Therefore, as to Smith's statements at the February 29, 2008 meeting, Plaintiff fails to establish a liberty interest.

Second, Plaintiff fails to show that Smith made stigmatizing statements to Prentice and Ramos[3] or HCSD employees in connection with her discharge from employment. "There must be some temporal nexus between the employer's statements and the termination." *Tibbetts,* 567 F.3d at 537 (quoting *Campanelli v. Bockrath,* 100 F.3d 1476, 1479, 1483 (9th Cir. 1996)). The Ninth Circuit has not adopted a bright line rule indicating when a temporal nexus exists. *Id.* However, the Ninth Circuit has concluded that statements made within one week of termination establishes a temporal nexus, *Campanelli,* 100 F.3d at 1483, but has noted that other courts have found that statements published five months after termination failed to establish a temporal nexus. *Tibbetts,* 567 F.3d at 538 (noting *Martz v. Incorporated Village of Valley Stream,* 22 F.3d 26, 32 (2d Cir. 1994)). Here, Plaintiff alleges she was constructively discharged on March 7, 2008 when she tendered her resignation. Plaintiff alleges that Smith made stigmatizing statements to Prentice at some point before the July 21, 2008 council meeting and to Ramos at some point before the August 7, 2008 council meeting – several months after Plaintiff resigned. Plaintiff alleges that Smith made stigmatizing statements to HCSD employees at the end of August 2008 – more than five months after her resignation. The court concludes that Plaintiff fails to establish a temporal nexus as to Smith's alleged

---

[3] In a separate cause of action, count 10, Plaintiff contends that Smith prevented her from being appointed to the Nevada Council for the Prevention of Domestic Violence by making stigmatizing statements to Ramos. (Pl.'s Opp'n to Smith's Mot. 40-41.) This allegation overlaps, in part, with Plaintiff's allegations in count 3. The court addresses all allegations with respect to Smith's communications to members of the council together because Plaintiff presents the same argument in regard to both count 3 and count 10. (*Id.* at 35-36, 40-41.)

statements to Prentice, Ramos, or HCSD employees. Unlike the statements in *Campanelli*, Smith's communications occurred much more than one week after Plaintiff's resignation. As noted by the Ninth Circuit in *Tibbetts*, statements made five months after termination fail to establish a temporal nexus. Smith's statements, made several months after Plaintiff's resignation, fall closer to the end of the spectrum where a temporal nexus ceases to exist.

Moreover, even if Plaintiff could establish a temporal nexus, Smith is entitled to qualified immunity with respect to Smith's alleged comments to Prentice, Ramos, and HCSD employees. "[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009)(citation and internal quotations omitted). In analyzing whether the defendant is entitled to qualified immunity, the court considers two issues. The court determines whether the plaintiff alleges a deprivation of a constitutional right, assuming the truth of his factual allegations, and whether the right at issue was "clearly established" at the time of defendant's alleges misconduct. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1241 (9th Cir. 2010)(quoting *Pearson*, 129 S. Ct. at 816). The court may address either issue first in light of the circumstances in the particular case at hand. *Pearson*, 129 S. Ct. at 818. "Whether a right is clearly established turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Clouthier*, 591 F.3d at 1241 (quoting *Pearson*, 129 S. Ct. at 822). Here, at the time periods at issue in this case, a reasonable person in Smith's position could not have known whether a stigmatizing statement made within several months after Plaintiff's termination would violate the temporal-nexus test. *See Tibbetts*, 567 F.3d at 538 (finding that the law was not clearly established that a stigmatizing statement made nineteen days after a plaintiff's termination would violate the temporal nexus test). Therefore, Smith is entitled to summary judgment on Plaintiff's substantive due process claims in count 3 and count 10.

/ / /

1

2.     Internship with HCSD

2      Plaintiff argues that she was subjected to Smith's stigmatizing statements to the HCSD,

3   which ultimately, were an actual cause of HSDC's revocation of her internship. (Pl.'s Opp'n to

4   HCSD's Mot. 23-24.)   HCSD contends that Plaintiff's claim fails because HCSD did not

5   publicize any reasons for the termination of Plaintiff's internship. (HCSD's Reply 6 (Doc.

6   #105).) The court agrees with HCSD. Plaintiff provides no evidence that HCSD publicized any

7   statements related to the termination of her internship. Thus, the court grants HCSD summary

8   judgment on the substantive due process claim in count 24.

9   **D.     SECTION § 1983 PROCEDURAL DUE PROCESS CLAIMS**

10      Plaintiff claims that HCSD violated her right to procedural due process under the

11   Fourteenth Amendment when it terminated her internship. (Pl.'s Second Am. Compl. 49-56.)

12   Plaintiff alleges that she had a property interest and a liberty interest in the continuation of her

13   internship. (*Id.*)

14      HCSD argues that Plaintiff fails to establish a protected property interest or liberty

15   interest and even if she could, HSDC provided her all the process she was due. (HCSD's Mot.

16   for Summ. J. 7-12.)

17      To state a procedural due process claim under Section 1983 Plaintiff must allege: "(1)

18   a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by

19   the government; [and] (3) lack of process." *Portman v. County of Santa Clara*, 995 F.2d 898,

20   904 (9th Cir. 1993). Like a substantive due process claim, a procedural due process claim

21   requires a plaintiff to establish a protected property or liberty interest beforeDue Process

22   Clauses protections are implicated.   As discussed above, Plaintiff fails to establish a

23   constitutionally protected property or liberty interest in her internship with the HCSD. Thus,

24   the due process protections of the Fourteenth Amendment are not implicated by the cessation

25   of Plaintiff's internship. Plaintiff's procedural due process claims fail as a matter of law. HCSD

26   is entitled to summary judgment on the procedural due process claims in count 20 and count

27   21.

28

1    **E.    SECTION § 1983 EQUAL PROTECTION CLAIM**

2         Plaintiff alleges that Smith and HCSD denied her the right to pursue her profession and

3    training through her internship because she held Wiccan beliefs.  (Pl.'s Second Am. Compl. 71-

4    73.) Plaintiff claims that Smith and HCSD harbored discriminatory animus toward her because

5    of her religious beliefs.  (Pl.'s Opp'n to Smith's Mot. 51.)  According to Plaintiff, her Wiccan

6    beliefs were a cornerstone of the discussions between Smith and HCSD employees and among

7    HCSD employees in deciding to terminate her internship.  (*Id.*; Pl.'s Opp'n to HCSD's Mot. 39-

8    40.)

9         "The Equal Protection Clause . . . is essentially a direction that all persons similarly

10   situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432,

11   439 (1985)(citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  In order to state a viable equal

12   protection claim, Plaintiff "must show that the defendant acted with an intent or purpose to

13   discriminate against him based upon his membership in a protected class." *Serrano v. Francis*,

14   345 F.3d 1071, 1082 (9th Cir. 2003) (citing *Barren v. Harrington*, 132 F.3d 1193, 1194 (9th Cir.

15   1998)).  "Intentional discrimination means that a defendant acted at least in part *because of*

16   a plaintiff's protected status." *Id.* (citing *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th

17   Cir. 1994) (emphasis in original).  "To avoid summary judgment, [plaintiff] 'must produce

18   evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the

19   evidence that the [defendant's] decision was . . . motivated'" by plaintiff's membership in a

20   protected class. *Serrano*, 345 F.3d at 1082 (quoting *Bingham v. City of Manhattan Beach*, 329

21   F.3d 723, 732 (9th Cir. 2003)(citations and alterations omitted)).

22        Where state action "does not implicate a fundamental right or a suspect classification,

23   the plaintiff can establish a 'class of one' equal protection claim by demonstrating that [he] 'has

24   been intentionally treated differently from others similarly situated and that there is no rational

25   basis for the difference in treatment.'"  *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944

26   (9th Cir. 2004), *overruled on other grounds by Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th

27   Cir. 2008).

28

1.   Smith

Plaintiff argues that Smith referenced her affiliation with Wicca to every HCSD employee with whom he spoke. (Pl.'s Opp'n to Smith's Mot. 51.) According to Plaintiff, Smith treated Plaintiff differently than other similarly situated persons because Smith failed to make a good faith attempt to treat Plaintiff's religious preference equally to other religious preferences held by other employees or citizens. (*Id.* at 51-52.) First, to the extent Plaintiff argues that she is a member of a protected class based on her religion, she fails to produce sufficient evidence that Smith acted with the intent or purpose to discriminate against her based on her Wiccan beliefs. Smith's references to Plaintiff's Wiccan beliefs appear to have been made within the context of describing what Smith believed to be inappropriate interactions between Plaintiff in her capacity as a Victim Witness Advocate and Garcia in her capacity as a victim. (Smith's Mot. for Summ. J. Ex. 2 at 135-36, 138; Pl.'s Opp'n to Smith's Mot. Ex. 28 at 86, Ex. 31 at 68.) At most, the evidence seems to show that Smith was concerned that Plaintiff engaged a victim in any religious discussion irrespective of the source of Plaintiff's religious beliefs. (*Id.*) In sum, Plaintiff fails to show that Smith acted *because of* Plaintiff's Wiccan beliefs.

Second, to the extent Plaintiff argues that Smith failed to treat her the same as other similarly situated individuals, she fails to provide evidence supporting her allegations. In her opposition to summary judgment, Plaintiff merely states that Smith treated her differently than "similarly situated persons." (Pl.'s Opp'n to Smith's Mot. 51.) Plaintiff offers no other argument or evidence as to the identity of the other individuals who were similarly situated to her or how Smith's actions differed as to them. Therefore, Smith is entitled to summary judgment on the equal protection claim in count 29.

2.   HCSD

Plaintiff argues that HCSD terminated her internship upon learning that she held Wiccan beliefs. (Pl.'s Opp'n to HCSD's Mot. 39-40.) According to Plaintiff, other individuals were allowed to complete internships while she was not. (*Id.*)

21

First, just as with her claim with respect to Smith, Plaintiff fails to to produce sufficient evidence that HCSD employees acted with the intent or purpose to discriminate against her based on her Wiccan beliefs. Although HCSD employees may have been aware that Plaintiff held Wiccan beliefs, Plaintiff fails to show that HCSD employees terminated her internship with the intent to discriminate against her based on her religious beliefs. Watts, Jenson, and Bumgartner all state that Plaintiff's internship was terminated based on the information Smith provided regarding Plaintiff's conduct with youth. (HCSD's Mot. for Summ. J. Ex. 2 at 2-4, Ex. 3 at 2-3, Ex. 4 at 2-3.) Plaintiff, herself, testified that during her meeting with Lords that Lords said to her that Smith told him "a lot of things" but that Lords "didn't care about any of the stuff except the issue with the youth . . . ." (HDSD's Mot. for Summ. J. Ex. 1 at 382.) Plaintiff merely establishes that HCSD employees had knowledge of her Wiccan beliefs. However, evidence of that knowledge does not equate to evidence of intentional discrimination.

Second, to the extent Plaintiff argues that she was treated differently from other similarly situated individuals, she fails to show that HCSD had no rational basis for the difference in treatment.[4] Plaintiff contends that two other individuals, Lynn Ludlow and Tyler Jack, completed internships with HCSD and that HCSD employees did not likely spend equal amounts of time discussing their religious preferences as they did Plaintiff's. (Pl.'s Opp'n to HCSD's Mot. 2, 39-40.) HCSD contends that Ludlow was an existing long-term employee of the HCSD before she undertook a school counselor internship and that Jack served as a paid school psychologist intern and not as an unpaid school counselor intern. Plaintiff fails to show that Ludlow and Jack were similarly situated to her. Unlike Ludlow, Plaintiff was not a long-term employee of the HCSD before commencing her counselor internship. Unlike Jack, Plaintiff was not a paid school psychologist intern. Plaintiff fails to provide evidence showing that HCSD treated her differently than other similarly situated individuals without a rational

---

[4] It is unclear whether Plaintiff's unpaid, voluntary internship with HCSD amounts to an employer-employee relationship. However, to the extent Plaintiff can be considered a public employee, her class-of-one equal protection claims is not cognizable. The class-of-one theory does not apply in the public employment context. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008).

1 basis.  Thus, HCSD is entitled to summary judgment on the equal protection claim in count 29.

2 **F.    SECTION § 1983 FIRST AMENDMENT FREE EXERCISE CLAIM**

3 Plaintiff alleges that Smith and HCSD violated her rights to freely exercise her religion
4 and freely associate under the First Amendment.  (Pl.'s Second Am. Compl. 64-66.)  Plaintiff
5 claims that Smith and HCSD prevented her from completing her internship because they
6 believed she is a Wiccan and associated with Wiccans.  (*Id.*)

7 Plaintiff appears to analogize her internship with HCSD to an employee-employer
8 relationship.  (Pl.'s Opp'n to HCSD's Mot. 37.)  Although not explicitly included in her
9 argument with respect to her First Amendment claim, Plaintiff argues with respect to other
10 claims the she had an implied contract with HCSD to continue her internship.  (*Id.* at 26-27.)
11 The court need not decide whether Plaintiff was an employee of HCSD because even if Plaintiff
12 could show she was an employee, her First Amendment free exercise claim fails.  Thus,
13 assuming for purposes of analysis that Plaintiff was an employee during her internship, the
14 court looks to law analyzing First Amendment claims asserted by government employees in
15 assessing Plaintiff's First Amendment free exercise claim.

16 When a government employee alleges that he has been punished in retaliation for
17 exercising his First Amendment rights, the employee must prove "(1) that the conduct at issue
18 is constitutionally protected, and (2) that it was a substantial or motivating factor in the
19 punishment." *Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 510 (9th Cir. 2004); *Strahan
20 v. Kirkland*, 287 F.3d 821, 825 (9th Cir. 2002).  Even if the employee discharges that burden,
21 "the government can escape liability by showing that it would have taken the same action even
22 in the absence of the protected conduct." *Settlegoode*, 371 F.3d at 510; *Strahan*, 287 F.3d at
23 825.

24 1.    Smith

25 Smith argues that Plaintiff fails to show that he took any punitive employment action
26 at the time Plaintiff served as an intern with HCSD. (Smith's Mot. for Summ. J. 23.)  The court
27 agrees.  Therefore, Smith is entitled to summary judgment on the free exercise and free

28

23

1    association claim in count 26.

2        2.    HCSD

3        HCSD does not dispute that Plaintiff's Wiccan beliefs constitute religious beliefs for

4    purposes of the First Amendment. (HCSD's Reply 8.)  However, HCSD argues that Plaintiff

5    fails to provide evidence that HSCD terminated her internship because of her religious beliefs.

6    (*Id.*)

7        HCSD is correct – Plaintiff fails to show that her practice or association with the Wiccan

8    religions was a substantial or motivating factor in the termination of her internship.  As

9    discussed above with respect to her equal protection claim, at most, Plaintiff shows that HCSD

10   employees were aware of her Wiccan beliefs.  However, Watts, Jenson, and Bumgartner all

11   state that Plaintiff's internship was terminated based on the information Smith provided

12   regarding Plaintiff's conduct with youth. (HCSD's Mot. for Summ. J. Ex. 2 at 2-4, Ex. 3 at 2-3,

13   Ex. 4 at 2-3.)  As discussed above, Plaintiff, testified that during her meeting with Lords that

14   Lords said to her that Smith told him "a lot of things" but that Lords "didn't care about any of

15   the stuff except the issue with the youth . . . ."  (HDSD's Mot. for Summ. J. Ex. 1 at 382.)  As

16   with her equal protection claim, Plaintiff merely establishes that HCSD employees had

17   knowledge of her Wiccan beliefs; however, Plaintiff fails to provide sufficient evidence from

18   which a reasonable jury could conclude that HCSD terminated her internship because of her

19   Wiccan beliefs. Thus, HCSD is entitled to summary judgment on Plaintiff's free exercise claim

20   in count 26.

21   **G.    SECTION § 1985 CONSPIRACY CLAIMS**

22       Plaintiff asserts several conspiracy claims against Smith, HCSD, and Parrish under 42

23   U.S.C. § 1985.  (Pl.'s Second Am. Compl. 17-24, 57-59, 61-70, 73-75.)

24           To state a cause of action under § 1985(3), a complaint must allege (1)
             a conspiracy, (2) to deprive any person or a class of persons of the equal
25           protection of the laws, or of equal privileges and immunities under the
             laws, (3) an act by one of the conspirators in furtherance of the
26           conspiracy, and (4) a personal injury, property damage or a deprivation
             of any right or privilege of a citizen of the United States.

27

28
                                        24

*Gillespie v. Civiletti*, 629 F.2d 637, 641 (9th Cir. 1980)(*citing Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971)).  Section 1985(3) applies only where there is a racial or other class-based discriminatory animus behind the conspirators' actions.  *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992).  "The absence of a section 1983 deprivation of rights precludes a section 1985 conspiracy claim predicated on the same allegations."  *Thornton v. City of St. Helens*, 425 F.3d 1158, 1168 (9th Cir. 2005) (quoting *Caldeira v. County of Kauai*, 866 F.2d 1175, 1182 (9th Cir. 1989)).  As discussed above in Sections A-F, none of Plaintiff's Section 1983 claims are viable.  Accordingly, because Plaintiff cannot sustain her Section 1983 claims, she fails to sustain Section 1985 claims based on the same facts.  Therefore, Smith, HCSD, and Parrish are entitled to summary judgment on the conspiracy claims in counts 4-6, 22, 25-28, and 30.

## H.   STATE LAW CLAIMS

Plaintiff asserts several state law claims in her complaint.  A federal court may retain jurisdiction of the pendant state claims even if the federal claims over which it had original jurisdiction are dismissed.  *Brady v. Brown*, 51 F.3d 810, 816 (9th Cir. 1995).  Where the court has dismissed all claims over which the court has original jurisdiction, the court may decline to exercise supplemental jurisdiction.  28 U.S.C. § 1367(c)(3).  "The decision to retain jurisdiction of state law claims is within the district court's discretion, weighing factors such as economy, convenience, fairness, and comity."  *Brady*, 51 F.3d at 816.  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Here, the court finds that retaining jurisdiction of the pendant state claims would not serve the economy or convenience of this court and that comity favors adjudication of the state law claims by a state tribunal.  Therefore, Plaintiff's state law claims should be dismissed without prejudice.

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that Smith's Motion for Summary Judgment (Doc. #81) is **GRANTED**.

**IT IS FURTHER ORDERED** that Parrish's Motion for Summary Judgment (Doc. #82) is **GRANTED**.

**IT IS FURTHER ORDERED** that Humboldt County School District's Motion for Summary Judgment (Doc. #79) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's state law claims are **DISMISSED** without prejudice.

**LET JUDGMENT ENTER ACCORDINGLY.**

DATED: August 27, 2010.

_____
UNITED STATES MAGISTRATE JUDGE